# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Cardiac Pacemakers, Inc.; and                        Civil No. 04-4048 (DWF/FLN)
Guidant Sales Corporation,

                    Plaintiffs,

v.                                                          **MEMORANDUM**
                                                     **OPINION AND ORDER**

Aspen II Holding Company, Inc.,
d/b/a Aspen Healthcare Metrics, LLC,

                    Defendant.

_____

Craig S. Coleman, Esq., John H. Hinderaker, Esq., Gerard M. Nolting, Esq., Faegre & Benson LLP, counsel for Plaintiff.

Douglas R. Boettge, Esq., and Lawrence J. Field, Esq., Leonard Street and Deinard, Norman K. Beck, Esq., Monika M. Blacha, Esq., Josh Goldberg, Esq., Sheri Klintworth Rudberg, Esq., Timothy J. Rivelli, Esq., and Dan K. Webb, Esq., Winston & Strawn, counsel for Defendant.

_____

## Introduction

The above-entitled matter came before the undersigned United States District Court Judge on December 15, 2005, pursuant to a Motion for Partial Summary Judgment brought by Plaintiffs Cardiac Pacemakers, Inc., and Guidant Sales Corporation (collectively, "Guidant") and a Motion for Summary Judgment brought by Defendant Aspen Healthcare Metrics, LLC ("Aspen"). In its Complaint (the "Complaint"), Guidant asserts the following causes of action: (1) tortious interference with confidentiality agreements; (2) tortious interference with contracts; (3) tortious interference with prospective contractual relations; and (4) misappropriation of trade secrets. Aspen asserts counterclaims for tortious interference with prospective contractual relations and defamation. For the reasons set forth

below, Guidant's Motion for Partial Summary Judgment is granted; Aspen's Motion for Summary

Judgment is denied.[1]

## Background

Cardiac Pacemakers, Inc. ("CPI"), manufactures implantable cardiac rhythm management

devices ("CRM devices"), such as pacemakers and defibrillators.  Guidant Sales Corporation ("GSC"),

a wholly-owned subsidiary of CPI, sells the devices.  Aspen is a healthcare consulting firm.

Guidant has entered sales contracts with approximately 3500 hospital customers for the sale of

CRM devices.  The sales contracts set forth supply terms, pricing, and contract durations. Guidant

maintains that its complex pricing approval process is built on analyzing and tailoring contracts according

to the specific needs of each customer.  Guidant asserts trade secret protection for three aspects of its

pricing:  (1) Guidant's strategic pricing process; (2) Guidant's contracts; and (3) each hospital's price

and contract terms.  Though still covered by confidentiality provisions, Guidant asserts that two types of

limited pricing information are not included in the trade secrets claim at issue here:  (1) discrete price

points paid by a particular hospital for CRM devices; and (2) average sales prices of Guidant's CRM

devices across multiple hospitals.

---

1       Guidant submitted a Motion to Strike the Affidavit of Douglas R. Boettge in Support of Aspen's
Reply Memorandum, asserting that the affidavit sought to circumvent the Court's briefing word limit.
Guidant maintains that the affidavit contained evidence in reply that could and should have been
submitted with Aspen's opening brief.  The Court does not need to reach the merits of Guidant's
Motion to Strike, because the affidavit does not change the outcome of the Court's decision.
Therefore, the motion is denied as moot.

Guidant's sales contracts contain the following confidentiality clause:

> Certain business information which both GSC and [customer] consider confidential (including this agreement) may not be shared.  GSC and [customer] agree not to disclose this information to any third party without prior written approval.

(Affidavit of Craig S. Coleman in Support of Guidant's Motion for Partial Summary Judgment ("Coleman Aff.") at ¶ 2, Ex. 1 at 1–12.)  Additionally, each page of Guidant's sales contracts states that "[i]nformation is confidential between Guidant Corporation and [customer]."  (*Id.*)

Aspen enters consulting contracts with hospitals.  Aspen's contracts state that Aspen is the hospital's "designated agent" for the purposes of "reviewing and discussing [the hospital's] confidential vendor pricing."  (Affidavit of Douglas R. Boettge in Support of Aspen's Motion for Summary Judgment ("Boettge Aff.") at ¶ 24, Ex. 30 at A000563.)  Aspen agrees to maintain the confidentiality of the hospital's proprietary information, and not to "divulge such information to any third parties . . . ."  (*Id.*)  Aspen's clients disclose their historical purchasing data for CRM devices as well as their vendor contracts to Aspen.  Aspen then uses its knowledge of hospitals' confidential pricing information to advise other hospital clients what to pay for CRM devices.  Aspen assists a hospital client in preparing a request for proposal ("RFP") to elicit vendor pricing proposals by identifying the appropriate prices at which to begin the negotiation process.  Aspen then analyzes and makes recommendations based on the merits of vendor proposals.  Although Aspen uses its knowledge of hospitals' confidential pricing information when advising other hospital clients, Aspen contends that it does not disclose one hospital's prices to another hospital.

In 2001, Guidant hired McKinsey & Company, a management consulting firm, to review Guidant's approach to pricing and to recommend pricing strategies.  Following this review, Guidant

3

maintains that it overhauled its pricing process, made fundamental organizational commitments to strategic pricing, and redoubled its emphasis on pricing confidentiality.  Guidant maintains that Aspen is the only consulting firm that obtains Guidant's CRM contracts, markets its knowledge of Guidant's CRM pricing, and recommends to its clients how much to pay for Guidant's CRM devices.

Guidant filed this lawsuit on August 9, 2004, against Aspen and another consulting firm.[2] Two days later, GSC president, Mark Bartell, sent a letter (the "August 11 Letter") to Guidant's customers regarding the lawsuit and Guidant's rationale for the lawsuit.  Aspen filed a counterclaim alleging that the August 11 Letter constitutes defamation and tortious interference with Aspen's prospective contractual relationships.  Specifically, Aspen claims that the following statements from the August 11 Letter are defamatory:

- "*Guidant has sought legal remedies against these two consulting firms based on it's* [sic] *belief that* these firms are engaging in unlawful activities that interfere with Guidant's ability to conduct business with its customers."

- "*Specifically, Guidant believes that* these two consultants have violated confidentiality agreements between Guidant and its hospital customers by improperly using confidential and proprietary information in other consulting engagements and by misrepresenting the nature of confidential information."

- "*In addition*, Guidant believes that these two consultants have unlawfully induced customers to breach their existing contracts."

- "Guidant feels very strongly that the way in which we can bring the most value to our hospital customers in through the ability to work collaboratively without the unlawful interference of these third party organizations."

---

2       Guidant subsequently settled its lawsuit against the other consulting firm.

- "Guidant believes that by removing what it considers to be the unlawful interference of these consultants, information confidential to our partnerships will be protected and the trust inherent within our existing relationships will be promoted."

(Defendant's Answer, Affirmative Defenses, and Counterclaim at 26–27 (emphasis added to show language Aspen omitted from August 11 Letter) (Coleman Aff. at ¶ 2, Ex. 53.).)

Aspen has moved for summary judgment on all four of Guidant's claims. Guidant has moved for partial summary judgment on its claim of tortious interference with confidentiality agreements and on both of Aspen's counterclaims.

First, Aspen asserts that Guidant's pricing information is readily available. Aspen maintains that on several occasions, Guidant permitted Aspen consultants to negotiate with Guidant representatives, and thereby disclosed its pricing information to Aspen. Aspen admits that Guidant occasionally objected to Aspen's participation in negotiations, but asserts that Guidant always ultimately "agreed to disagree" and provided its pricing despite Aspen's presence. (Corrected Memorandum in Support of Defendant/Counterplaintiff's Motion for Summary Judgment ("Defendant's Motion for Summary Judgment") at 9.) Guidant, however, maintains that it has never authorized Aspen to obtain its contracts or CRM pricing information from hospitals. Prior to the few occasions where Guidant submitted pricing proposals to hospitals knowing that Aspen would receive them, Guidant asserts that Aspen had already induced the hospital to breach Guidant's confidentiality agreements. Guidant therefore asserts that it mitigated that damage by attempting to keep the hospital's business.

Second, Aspen further contends that Guidant's CRM pricing is readily available within the industry. Aspen points out that in 2002, Guidant engaged a market research firm, Millennium Research Group ("MRG"), to obtain market share and per-unit pricing information for CRM devices sold by

Guidant and its competitors to hospitals nationwide.  MRG received survey responses from hospitals that contained the prices the hospitals had paid for Guidant CRM devices.  Aspen also asserts that the Freedom of Information Act ("FOIA") provides another readily available source of Guidant's CRM pricing.  Aspen contends that during the course of this litigation, it submitted FOIA requests to public hospitals seeking Guidant pricing information and received such information from 46 hospitals.

Additionally, Aspen contends that ECRI, a non-profit organization seeking to improve the safety, quality, and cost-effectiveness of healthcare, disclosed CRM pricing information through a service called "PriceGuide."  PriceGuide is an online data benchmarking service allowing customers to access the prices paid by other hospitals for various products, including the CRM devices of Guidant and its competitors.  Aspen maintains that approximately 400 hospitals and vendors subscribe to PriceGuide.

Aspen also contends that Guidant pricing is readily available in industry publications such as Hospital Materials Management ("HMM").  Aspen contends that since 1999, HMM has published the annual results of its hospital surveys of pacemaker prices.  Aspen contends that in its July 2004 survey of 3000 hospitals, HMM reported the average HMM and ECRI survey prices for at least fifty individually identified Guidant products.  Aspen also contends that group purchasing organizations obtain and benchmark Guidant CRM pricing.  Aspen points out that Novation, a group purchasing organization ("GPO"), contracts for Guidant products on behalf of its member hospitals, and is under no obligation to maintain the secrecy of Guidant's pricing.  Aspen also asserts that Premier, another GPO, has a contract with Guidant in which Guidant discloses its CRM pricing.  Finally, Aspen contends that physicians readily obtain Guidant CRM pricing, even when the physicians are not employed by the

hospital or subject to any confidentiality agreements with Guidant.

Guidant asserts that its pricing information is not generally available.[3]   Guidant maintains that MRG collects only price points and not contracts or contract terms.  Guidant asserts that it owns all data collected by MRG and does not disclose this information to any third party.  Guidant also maintains that Premier does not obtain Guidant's contracts from its members and is not aware of any hospital that submits Guidant's pricing to its CardiacFocus service.

Likewise, Guidant maintains that Novation does not obtain Guidant's contracts from hospitals and knows that doing so would be inappropriate.  Guidant asserts that there is no evidence that Novation has ever disclosed Guidant's prices to anyone.  Guidant also asserts that ECRI instructs PriceGuide participants not to breach confidentiality agreements with Guidant and is not aware of any hospitals that submit Guidant's pricing to ECRI in violation of those agreements.  Finally, Guidant asserts that it prohibits its sales staff from disclosing prices to doctors who are not employed by hospitals.  Guidant asserts that Aspen can point to only one exception where a doctor who was not employed by a hospital gained access to Guidant's prices.

Guidant maintains that it has taken reasonable measures to protect its pricing information. Guidant asserts that George Murphy, a corporate security expert, conducted an extensive investigation into Guidant's efforts to protect its trade secret pricing information.  Murphy found that Guidant's efforts

---

3    Guidant contends that Aspen has provided no foundation for the HMM articles, asserting that there is no explanation of HMM's survey or methodology.  Therefore, Guidant asserts that the HMM articles are inadmissible and should be disregarded on summary judgment.  The Court finds that genuine issues of material fact exist as to Guidant's trade secret claim, regardless of whether the HMM articles are found inadmissible.  Therefore, the Court need not reach this issue.

to protect the secrecy of its pricing information were reasonable.  Guidant also points to the

confidentiality provisions in its sales contracts as evidence of its effort to protect its pricing information.

## Discussion

### I.    Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court must view

the evidence and the inferences, which may be reasonably drawn from the evidence in the light most

favorable to the nonmoving party.  *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747

(8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is

properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal

Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of

every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and

that it is entitled to judgment as a matter of law.  *Enterprise Bank*, 92 F.3d at 747.  The nonmoving

party must demonstrate the existence of specific facts in the record which create a genuine issue for trial.

*Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly

supported motion for summary judgment may not rest on mere allegations or denials, but must set forth

specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 256 (1986).

### II.    Guidant's Claims

#### A.    Tortious Interference with Confidentiality Agreements

8

In order to prevail on a tortious interference with contract claim, the plaintiff must demonstrate the existence of a contract, the alleged wrongdoer's knowledge of the contract, and an intentional procurement of its breach, without justification, that results in damage to the plaintiff. *Maness v. Star-Kist Foods, Inc.*, 7 F.3d 704, 709 (8th Cir. 1993) (citing *Furlev Sales and Assocs., Inc. v. North American Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982)). The defendant bears the burden of proving justification. *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994). Aspen does not dispute the existence of the confidentiality agreements, nor its knowledge of the agreements.

Guidant asserts that Aspen has no valid legal justification for inducing the hospitals to breach the confidentiality agreements. Specifically, Guidant asserts that Aspen cannot be considered an "agent" of the hospitals because Aspen lacks any ability to bind the hospitals. Guidant further asserts that no legal justification supports Aspen's claim that its conduct is sanctioned by its status as a consultant. Finally, Guidant asserts that it has been damaged by Aspen's conduct.

Aspen counters that it has not procured the breach of Guidant's confidentiality agreements with the hospitals because, as a consultant, Aspen is not a "third party." Aspen also asserts that the term "third party" in Guidant's confidentiality agreements is ambiguous. Aspen asserts that any ambiguity over "third party" must be construed against Guidant, the contract drafter. Second, Aspen contends that Guidant's tortious interference claims are displaced by the Minnesota Uniform Trade Secrets Act ("MUTSA"). Third, Aspen asserts that Aspen was an agent, and therefore, could not breach its hospital clients' confidentiality agreements with Guidant. Fourth, Aspen maintains that its conduct is justified by the consultant and honest-advice privileges. Finally, Aspen asserts that genuine issues of material fact remain on causation and damages.

The Court finds that, as a matter of law, the confidentiality agreements were breached, Aspen has not sustained its burden of asserting a valid legal justification, and Guidant has demonstrated that there is no genuine issue of material fact as to whether Guidant has been damaged by Aspen's intentional procurement of the breach of the confidentiality agreements.  First, the Court finds that there is no ambiguity in Guidant's confidentiality agreements.  The confidentiality agreements state that "[c]ertain business information which both GSC and [customer] consider confidential (including this agreement) may not be shared.  GSC and [customer] agree not to disclose this information to any third party without prior written approval."  (Coleman Aff. at ¶ 2, Ex. 1 at 1-12.)  Additionally, each page of Guidant's sales contracts states that "[i]nformation is confidential between Guidant Corporation and [customer]." (*Id.*)

The term "third party" is not ambiguous because the confidentiality agreement expressly states that only Guidant and the hospital may have the information and that the information cannot be shared with *any* third party without authorization.  Aspen is therefore, a third party under the confidentiality agreement.  Additionally, the Court rejects Aspen's contention that it cannot be considered a "third party" because Guidant does not treat its own consultant, McKinsey & Co., as a "third party." Whether Guidant should have obtained hospitals' authorization before disclosing its prices with McKinsey is irrelevant to interpreting the confidentiality agreements.

Second, the MUTSA does not displace Guidant's tortious interference claim.  The MUTSA states that it "displace[s] conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret."  Minn. Stat. § 325C.07(a) (2004).  Therefore, law which conflicts with the MUTSA is displaced. *Micro Display Sys., Inc. v. Axtel, Inc.*, 699 F. Supp.

202, 205 (D. Minn. 1988) (holding that "conflicting law" is "that law dealing exclusively with trade

secrets.").  Under this displacement provision, courts will allow plaintiffs to maintain separate causes of

action "to the extent that causes of action have 'more' to their factual allegations than the mere misuse or

misappropriation of trade secrets."  *Id.*

The Court rejects Aspen's assertion that Guidant's tortious interference claim constitutes

repleading of Guidant's trade secret claim.  Guidant's claim for tortious interference with confidentiality

agreements rests on different factual and legal grounds than Guidant's trade secrets claim.  Here, the

fact of the confidentiality agreements render the trade secrets inquiry irrelevant because Aspen can be

found liable for inducing hospitals to breach Guidant's confidentiality agreements regardless of whether

the contracts are trade secrets.  Moreover, the Court finds that Aspen's reliance on *SL Montevideo*

*Tech., Inc. v. Eaton Aerospace, LLC,* 292 F. Supp. 2d 1173 (D. Minn. 2003), is misplaced.  In

*Montevideo*, the plaintiff did not allege breach of a confidentiality agreement.  *Id.* at 1179.

Third, the Court finds that Aspen was not an agent as a matter of law.  Aspen claims that it was

an agent for the hospitals because Aspen's typical hospital contract identifies Aspen as a "designated

agent in reviewing and discussing [the hospital's] confidential vendor pricing . . . ."  (Boettge Aff. at ¶

24, Ex 30 at A000563.)  In support of its claim, Aspen cites the Restatement (Second) of Agency § 1

(1958), which defines agency as "the fiduciary relation which results from the manifestation of consent

by one person to another that the other shall act on his behalf and subject to his control, and consent by

the other so to act."

Guidant, on the other hand, asserts that Minnesota courts determine whether agency exists

based on the agent's authority to bind the principal when dealing with third parties.  Guidant cites

11

several cases in support of its position.  As additional support, Guidant cites the Restatement (Second)

of Agency § 12 (1958), which states that an "agent or apparent agent holds a power to alter the legal

relations between the principal and third persons . . . ."  Further, Guidant asserts that Aspen admits it

lacks the authority to bind hospitals as evidenced by its admonition that the hospitals "were free to

accept or reject" its advice.  (Plaintiffs/Counter Defendants' Reply Memorandum in Support of

Guidant's Motion for Partial Summary Judgment ("Plaintiffs' Reply Memorandum") at 7 (quoting

Defendant/CounterPlaintiff's Response to Plaintiffs'/CounterDefendants' Motion for Partial Summary

Judgment ("Defendant's Response Memorandum") at 8.)

   Minnesota courts have held that an agent must have authority to bind the principal when acting

on the principal's behalf.  *Tullis v. Federated Mut. Ins. Co.*, 570 N.W.2d 309, 313 (Minn. 1997);

*Vacura v. Haar's Equip., Inc.*, 364 N.W.2d 387, 391 (Minn. 1985); *Jurek v. Thompson*, 241

N.W.2d 788, 791 (Minn. 1976); *Lee v. Peoples Co-op. Sales Agency*, 276 N.W. 214, 216–17

(Minn. 1937); *Mikulay v. Home Indem. Co.*, 449 N.W.2d 464, 467 (Minn. Ct. App. 1989), *review

denied* (Minn. Feb. 21, 1990).  The Court rejects Aspen's assertion that *Johnson v. Ostenso*, 84

N.W.2d 269, 272 (Minn. 1957), stands for the proposition that an agent is not required to bind its

principal to a contract.  In *Johnson*, the court held that a designated agent for an insurance company

had the authority to set the start date for an insurance policy, thus binding the insurance company.  *Id.*

Because only the start date for the coverage was at issue, the court noted that it did not have to

determine whether the agent could bind the company to the underlying insurance agreement.  *Id.*

Therefore, the holding in *Johnson* comports with the holdings in the other cases Guidant has cited that

look to agents' authority to bind their principals when determining the existence and scope of an agency

relationship.  Here, Aspen's consulting agreements merely state that Aspen may review and discuss

hospitals' confidential vendor pricing.  Thus, Aspen lacks the authority to bind its hospital clients or act

on their behalf and, as a matter of law, cannot be considered an agent.

Finally, the Court finds that Aspen's conduct is not protected by the consultant and honest-

advice privileges.  Aspen contends that, as a consultant providing advice in good faith to hospitals about

how to lower their supply costs, it cannot be held liable for tortious interference with confidentiality

agreements.  Aspen relies on the Restatement (Second) of Torts § 772 (1979) to define this privilege:

"One who intentionally causes a third person not to perform a contract or not to enter into a prospective

contractual relation with another does not interfere improperly with the other's contractual relation, by

giving the third person (a) truthful information, or (b) honest advice within the scope of a request for the

advice."  Aspen contends that Minnesota adopted this defense in *Glass Service Co., Inc. v. State

Farm Mut. Auto. Ins. Co.*, 530 N.W.2d 867, 871–72 (Minn. Ct. App. 1995).  Aspen admits that

Minnesota has not addressed the privilege in the context of consultants, but asserts that the Court should

look to other jurisdictions that have addressed the issue.

The Court agrees with Guidant that even if an honest-advice privilege existed in Minnesota,

Aspen cannot invoke such a defense.  First, Guidant asserts that before it is retained as a consultant,

Aspen obtains Guidant's confidential prices to entice hospitals with projected cost savings.  (*See

Coleman Aff. Ex. 24.)  Second, Guidant asserts that the act of obtaining confidential contracts is not

advice.  Rather, Guidant asserts that Aspen's clients breach Guidant's confidentiality agreements by the

act of forwarding Guidant's confidential pricing before any advice is given.  Finally, Guidant asserts that

the honest-advice privilege cannot apply because Aspen's conduct of "trafficking in Guidant's

13

confidential pricing" is entirely self-serving and dishonest.  (Plaintiffs' Reply Memorandum at 11.)  The Court finds that Aspen could not invoke an honest-advice privilege even if such a defense existed in Minnesota because obtaining Guidant's confidential pricing and using that information at other hospitals does not constitute honest advice.

Having found that Aspen has not sustained its burden for showing that it was justified in intentionally procuring the breach of the confidentiality agreements, the Court turns to the final element of damages.  The Court finds that, as a matter of law, Guidant has sustained damages. Guidant asserts that Aspen's CRM consulting practice is premised on reducing the prices that Guidant's hospital customers pay.  Guidant points to Aspen's cost-savings reports that indicate the amount a hospital has saved for CRM devices by entering a consulting engagement with Aspen.  (Coleman Aff. at ¶ 2, Ex. 63.)  As an example, Guidant notes that Aspen's cost savings report for Scripps Health states that Scripps will pay $1.75 million less for Guidant's CRM products due to Aspen's consulting.  (*Id.,* Ex. 62.)  Moreover, Guidant notes that Scripps Health's vice president confirmed at his deposition that Aspen's consulting resulted in Guidant losing $2 million.  (*Id.*, Ex. 66.)  On this evidence, the Court finds that there is no genuine issue of fact as to whether Aspen's tortious interference damaged Guidant.  The Court rejects Aspen's assertion that fact issues remain regarding whether Guidant's damages were directly caused by Aspen's conduct.  The Court finds, however, that fact issues exist as to the amount of damages. [4]

The Court finds that, as a matter of law, Guidant prevails on its claim of tortious interference with confidentiality agreements.  Thus, summary judgment in favor of Guidant is warranted on this claim.

---

[4]        Guidant acknowledges that fact issues exist regarding the amount of damages.

**B.** **Tortious Interference with Contracts and Tortious Interference with Prospective Contractual Relations**

Aspen asserts that it is entitled to summary judgment on Guidant's tortious interference with contracts and tortious interference with prospective contractual relations because:  (1) Aspen is an agent; (2) the MUTSA displaces Guidant's tortious interference claims; (3) the hospitals have not breached their contracts with Guidant; and (4) the honest-advice and consultant's privileges protect Aspen's conduct.  The Court has already addressed these contentions with regard to Guidant's tortious interference with confidentiality agreements and found that they do not afford Aspen relief.  Thus, the Court finds that Aspen is not entitled to summary judgment on Guidant's claims for tortious interference with contracts and tortious interference with prospective contractual relations.

**C.** **Misappropriation of Trade Secrets**

To establish the existence of a trade secret under the MUTSA, a plaintiff must prove that: (1) the information is not generally known or ascertainable; (2) the information provides a demonstrable competitive advantage; and (3) the information was subject to reasonable efforts to maintain its secrecy.  Minn. Stat. § 325C.01, subd. 5; *Strategic Directions Group, Inc. v. Bristol-Meyers Squibb Co.*, 293 F.3d 1062, 1064–65 (8th Cir. 2002).  Misappropriation includes:

> disclosure or use of a trade secret of another without express or implied consent by a person who:  (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that the discloser's or user's knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or . . . derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

Minn. Stat. § 325C.01, subd. 3.

Aspen asserts that Guidant's CRM prices are not trade secrets because the information is

readily ascertainable.  Aspen asserts that Guidant has disclosed this information to Aspen, as well as to entities in the industry.  Aspen cites MRG, FOIA, ECRI, GPOs like Novation and Premier, physicians, and HMM's published surveys in support of this assertion.  Aspen also contends that Guidant's CRM pricing has no independent economic value and that Guidant made no reasonable efforts to protect its alleged trade secrets.  Aspen specifically contends that Guidant's efforts are not reasonable because Guidant discloses its own pricing information to MRG, benchmarking firms, and physicians.  Aspen further contends that Guidant's confidentiality clauses in its sales contracts failed to provide adequate notice to hospitals that Guidant's CRM pricing is secret.  Finally, Aspen contends that it did not misappropriate Guidant's CRM prices.  In support of this contention, Aspen asserts that it acquired Guidant's CRM pricing information by proper means because it is an agent of the hospitals and that Aspen's use of the information was authorized.

Guidant, on the other hand, asserts that disputes of fact preclude summary judgment on Guidant's claim of misappropriation of trade secrets.  Guidant asserts that its CRM pricing provides economic value, noting that Aspen attempts to keep the same pricing information secret.  Guidant also asserts that its CRM pricing information is not readily ascertainable.  Guidant asserts that its business model confirms that its pricing information is not generally available, it has never authorized Aspen to obtain its contracts, Aspen is the only firm that obtains Guidant's CRM contracts, and Aspen has not demonstrated the availability of any Guidant pricing information from other sources.  Guidant asserts that it has taken reasonable measures to protect its trade secrets.   Guidant points to its confidentiality provisions in its sales contracts, asserts that it has acted reasonably in the few instances it disclosed prices to Aspen, and asserts that it protects its pricing information from third parties.

Finally, Guidant asserts that Aspen misappropriates Guidant's trade secrets.  Guidant asserts that Aspen is not an agent of its consulting clients, that Guidant has not consented to hospitals' disclosing their pricing information and contracts with Aspen, and that Aspen sells its knowledge of Guidant's pricing information for its own financial gain.

The Court finds that genuine issues of material fact remain as to whether Guidant's pricing information was readily ascertainable, whether it provides an economic advantage, and whether it is subject to reasonable measures of protection.  While the Court finds that Aspen is not an agent of its hospital customers, the Court finds that fact issues remain regarding whether Aspen misappropriated Guidant' alleged trade secrets.   Therefore, summary judgment is not appropriate on this claim.

## III.    Aspen's Counterclaims

### A.    Defamation

To establish that a statement is defamatory under Minnesota law, the plaintiff must demonstrate that the statement is false, was communicated to a third party, and tends to harm the plaintiff's reputation. *Bol v. Cole*, 561 N.W.2d 143, 146 (Minn. 1997).  A true statement cannot be defamatory. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980).  Whether a statement can be proven false is a question of law.  *Geraci v. Eckankar*, 526 N.W.2d 391, 397 (Minn. Ct. App. 1995).  In determining whether a statement can be proven false, Minnesota courts consider the following factors:  "(1) specificity and precision [of the statement]; (2) verifiability; (3) literary and social context in which it was made; and (4) public context."  *Id.* (citing *McGrath v. TCF Bank Sav.*, 502 N.W.2d 801, 808 (Minn. Ct. App. 1993)).  The First Amendment protects expressions of opinion not "sufficiently factual to be susceptible of being proved true or false." *Hunter*

*v. Hartman*, 545 N.W.2d 699, 706 (Minn. Ct. App. 1996) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990)).

Guidant asserts that the statements in the August 11 Letter were true or, alternatively, were constitutionally protected statements of opinion that cannot be disproved. Guidant also asserts that Aspen has failed to demonstrate that it was damaged by Guidant's statements. Finally, Guidant asserts that that the statements in the August 11 Letter are constitutionally protected by qualified immunity. Aspen, on the other hand, asserts that disputed material issues of fact exist as to whether the statements are true or false. Aspen also asserts that it has established sufficient evidence of its damages. Finally, Aspen asserts Guidant either waived any privileges or cannot establish its burden to demonstrate a qualified privilege.

The Court must first determine whether the statements in the August 11 Letter are capable of being proven true or false. Here, all of the statements allege that Aspen was involved in unlawful activities. For example, Guidant states that it believes Aspen has "violated confidentiality agreements" between Guidant and its customers." The Court finds that such statements are sufficiently precise and verifiable that they can be proven true or false. The Court, however, finds that the statements are not actionable because they are true. Here, the Court has determined that Aspen tortiously interfered with confidentiality agreements. Thus, Aspen has engaged in unlawful activity. Because truth is a complete defense, the Court finds that the statements are not defamatory as a matter of law.

The Court also finds that Guidant's statements were protected by a qualified privilege.[5]  To be privileged, a statement "must be made in good faith and must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause."  *Bol*, 561 N.W.2d at 149. The court determines qualified privilege as a matter of law.  *Id.*  The statements in the August 11 Letter were made to Guidant's customers.  Guidant had a legitimate interest in disclosing the fact of the lawsuit and its rationale for the lawsuit.  Thus, Guidant's statements satisfy the factors of the qualified privilege.

When qualified privilege applies, the speech is constitutionally protected unless the claimant can prove that the statements were made with actual malice.  *Id.* at 150.  In order to show malice, the claimant must demonstrate that the speaker acted with "actual ill-will or a design causelessly and wantonly to injure plaintiff."  *Id.*  (citation omitted).  As evidence of actual malice, Aspen cites internal Guidant documents in which the Guidant president referred to consultants as "leeches," Guidant discussed its efforts to "eradicate" consultants from the industry, and Guidant stated that it wished to "create a living hell for Aspen consulting."  (Defendant's Response Memorandum at 41.)  Aspen does not allege that Guidant's president was referring to Aspen when he allegedly called consultants "leeches."  As a matter of law, the Court finds that Aspen cannot demonstrate that Guidant made the statements in the August 11 Letter with "actual ill-will or a design causelessly and wantonly to injure

---

5       Aspen asserts that Guidant waived any privileges because Guidant did not plead any affirmative defenses of privilege in its answer to Aspen's counterclaim.  In response, Guidant contends that qualified privilege is premised on the First Amendment, and that Guidant pleaded that its speech is protected by the Constitution.  Further, Guidant contends that Aspen has not claimed any resulting prejudice resulting from Guidant's alleged failure to plead the privilege.  The Court finds that Guidant has not waived any privileges and notes that this is not a case where Guidant has alleged new facts in an untimely fashion.  Regardless, Aspen has not sustained any prejudice.

19

plaintiff."

Because the Court finds that the statements in the August 11 Letter were true, and that in any

event the statements were protected by qualified privilege, the Court does not need to reach the issue of

damages. Accordingly, the Court finds that Guidant is entitled to summary judgment as a matter of law.

**B.     Tortious Interference with Prospective Contractual Relations**

In order to establish a tortious interference with prospective contractual relations claim, a

plaintiff must show that a defendant intentionally and improperly interfered with the plaintiff's prospective

business relations. *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 632–33 (Minn. 1982).

Minnesota courts consider the following factors when determining whether the underlying conduct is

improper:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the
> contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference and
> (g) the relations between the parties.

*Northside Mercury Sales & Service, Inc. v. Ford Motor Co.*, 871 F.2d 758, 761 (8th Cir. 1989)

(quoting the Restatement (Second) of Torts § 767 (1979)).

Guidant asserts that it had no knowledge regarding Aspen's prospective relationships with

hospital clients. Without knowledge of Aspen's marketing efforts, Guidant asserts that it could not have

intended to disrupt Aspen's prospective economic relationships with certain hospitals. Guidant also

asserts that its August 11 Letter was not improper because it was not defamatory. Finally, Guidant

asserts that Aspen cannot prove that it would have commenced an economic relationship with any

particular hospital but for Guidant's actions.

Aspen asserts that genuine issues of material fact exist as to whether Guidant's conduct was

intentional, improper, and whether it resulted in damages to Aspen's business.  Aspen asserts that

Guidant had knowledge of Aspen's relationships because Guidant was monitoring those relationships

through its "consultant tracking database."  Aspen also asserts that Guidant circulated the August 11

Letter to Aspen's potential customers.  Aspen asserts that Guidant's conduct was improper because it

was defamatory.  Aspen further asserts that even if Guidant's conduct was not defamatory, it was still

improper because Guidant sought to "disrupt consultant operations."  (Defendant's Response

Memorandum at 45.)  Finally, Aspen asserts that material issues of fact exist as to whether Guidant's

August 11 Letter resulted in Aspen's loss of prospective business.

The Court finds that, as a matter of law, Guidant's conduct was not improper because the

August 11 Letter was not defamatory.  Because the Court finds that Aspen cannot establish that

Guidant's conduct was improper, the Court does not need to address whether Guidant's conduct was

intentional or whether Aspen was damaged by Guidant's conduct.  Accordingly, Guidant is entitled to

summary judgment as a matter of law.

### Conclusion

Accordingly, **IT IS HEREBY ORDERED THAT:**

1.      Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 156) is **GRANTED**.

      a.      Counts I and II of the Answer, Affirmative Defenses, and Counterclaim

are **DISMISSED WITH PREJUDICE**.

2.      Defendant's Motion for Summary Judgment (Doc. No. 162) is **DENIED**.

3.      Plaintiffs' Motion to Strike Affidavit in Support of Aspen's Reply

Memorandum (Doc. No. 197) is **DENIED** as moot.

Dated:  February 2, 2006                 s/Donovan W. Frank
                                         DONOVAN W. FRANK
                                         Judge of United States District Court